# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

_____

MARK BERARDICURTI,

                                        Plaintiff,

-v-                                                    DECISION AND ORDER

JO ANNE B. BARNHART, Commissioner of Social            05-CV-6333 CJS
Security,

                                        Defendant.

_____

## APPEARANCES

For Plaintiff:                   Alan L. Glaser, Esq.
                                 450 Reynolds Arcade Building
                                 16 East Main Street
                                 Rochester, NY 14614
                                 (585) 232-4080

For the Commissioner:            Brian M. McCarthy, A.U.S.A.
                                 U.S. Attorney's Office
                                 100 State Street Room 620
                                 Rochester, NY 14614
                                 (585) 263-6760


## INTRODUCTION

**Siragusa, J.** This Social Security case is before the Court on the
Commissioner's motion (# 10) for judgment on the pleadings and plaintiff's cross-
motion, also for judgment on the pleadings or, in the alternative, for a remand of the
matter for a new hearing before a different administrative law judge (# 14). For the rea-

sons stated below, the Commissioner's decision denying benefits is reversed, and the matter is remanded for further administrative proceedings.[1]

## BACKGROUND

Plaintiff applied for disability insurance benefits and Supplemental Security Income ("SSI") on August 15, 2001, claiming to be unable to work since April 1, 2001 due to bilateral patello (R.[2] 63-65, 76.) The Social Security Administration denied his application, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 30-39.) At the hearing, which was held on May 25, 2004, plaintiff was represented by Kevin J. Bambury, Esq. (R. 203, 205.) Eugene Churchman, a vocational expert, testified via telephone. (R. 205, 229-40.) The ALJ issued a decision on September 27, 2004, finding that plaintiff was not disabled. (R. 242-57.) Plaintiff sought review from the Appeals Council and, on February 18, 2005, the Appeals Council notified him that it would review the decision. (R. 15-18, 21-24.) On June 2, 2005, the Appeals Council issued a partially favorable decision, finding that plaintiff was disabled from March 7, 2002 to November 6, 2003, but not prior to, or following, that period. (R. 7-12.) This became the final decision of the Commissioner. On June 22, 2005, plaintiff commenced

---

[1]At oral argument, counsel for the Commissioner withdrew the contention, raised in her reply memorandum of law, that plaintiff's request for a determination that he was disabled prior to March 7, 2002 should be denied based upon the fact that "in a submission to the Court dated March 1, 2006, plaintiff stated that he was only appealing that part of the Appeals Council's decision which found that he was not disabled after November 6, 2003." Def.'s Reply Mem. of Law p. 2.

[2]Refers to the Record on Appeal, consisting of two volumes. One is dated September 20, 2005, and the supplemental volume is dated February 23, 2006. The supplemental volume contains only the Administrative Law Judge's decision of September 27, 2004, and the notice of that decision to plaintiff, also dated September 27, 2004.

the instant action to reverse the Commissioner's determination that he was not entitled to SSD or SSI benefits for the periods before March 7, 2002 and after November 6, 2003.

**Plaintiff's Testimony and Non-Medical Evidence**

Plaintiff, who was born on October 27, 1962, completed high school and one year of college. (R. 63, 82, 208.) He has past relevant work as a maintenance man, cashier clerk and banquet manager. (R. 77, 230-33.)

At the hearing before the ALJ, plaintiff testified that in 2001 he underwent physical therapy on his knees for five and one-half months. (R. 214.) He further indicated that he wore knee braces, although he did not specify for how long. (R. 214-15.) From April to December 2001, plaintiff said that the pain in his knees, and in his feet as well, was constant, limiting his ability to walk. (R. 218-20.) He rated the pain in his knees, on a scale of one to ten (with ten being the worst pain), as a seven, and the pain in his feet as a six, or six-and-one-half. (R. 220.) Plaintiff testified he was prescribed and took hydrocodone, and that while the medication relieved the pain his knees and feet, it caused drowsiness. (*Id*.) Additionally, plaintiff testified that in 2002 he experienced the same level of pain in his knees and feet. (R. 220-21.)

At the hearing, plaintiff testified that he had right knee surgery in January 2003 and left knee surgery in April 2004. (R. 211, 214, 221.) As to his right knee, he stated that, although it took him about eight months to recover, the surgery was successful and he no longer experienced pain there. (R. 221, 225.) As to his left knee, plaintiff testified that he was still recovering from the surgery and was still experiencing pain. (R.

221.) He also stated that his doctor[3] did not order rehabilitation for his left knee, be-

cause the doctor believed plaintiff could take care of it himself. (R. 227.)

Plaintiff brought bottles of hydrocodone and ibuprofen with him to the hearing. As

to both hydrocodone and ibuprofen, plaintiff stated that he had been taking them since

his last surgery and that he had taken them after his previous surgery. (R. 222-23.) The

ALJ noted that the bottle of hydrocodone was dated May 3, 2004 and that it had "50

pills in it when it was filled. It's almost full." (R. 223.) The ALJ also noted that the "bottle

of ibuprofen is dated 8/5/03. It had 90 pills in it when it was filled. It, too, is almost full."

(R. 224.) Plaintiff explained that this was because he added pills from new prescriptions

of the medications into the bottles he had at the hearing. (*Id*.) However, the ALJ ob-

served that a drug prescription list from plaintiff's pharmacy, dated from April 1, 2001 to

June 6, 2004, revealed that plaintiff's last prescription for hydrocodone was filled on

May 3, 2004 (50 pills), and that the last prescription for ibuprofen was filled on August

5, 2003 (90 pills). (R. 93.)

Plaintiff also testified that he had, "osteoporosis, arthritis in the arches of my feet

which is on the tendons going to the toes and it's inoperable." (R. 219.) He indicated

---

[3]Plaintiff referred to Louis Tallo, D.P.M., as the doctor who had not ordered physical therapy following his left knee surgery. (R. 226-27.) From the record, however, it appears that Dr. Tallo was a surgeon and acted as a consultant for John A. Jurik, M.D., plaintiff's treating physician. (R. 119-20.) From his August 12, 2002 letter to Dr. Jurik, it appears that Dr. Tallo concentrated his examination on plaintiff's left foot, which he concluded contained a "3 centimeter by 3 centimeter cystic mass to the left plantar central arch." (Letter from Dr. Tallo to Dr. Jurik (Aug. 12, 2002) at 1 (R. 120).)

that Dr. Tallo and Dr. Hyden[4] had given him inserts for his shoes about a year prior to the hearing but that he had not seen either doctor since that time. (R. 219, 226.) He further testified that the inserts caused numbness and that since his last surgery he was able to walk for only fifteen minutes, compared to thirty minutes previously. Moreover, while he indicated that he could stand for twenty minutes (R. 216), he explained that, since his right knee surgery he required the use of crutches and then a cane. (*Id*.). Furthermore, plaintiff stated that, since the surgery, he had been able to bend at the waist "a little," but that he would lose his balance if he did not have something to hang on to. (R. 216.) In addition, he said that he had no problem bending prior to the surgery, "[b]ecause I had a brace on, also." (R. 217.) He testified that, while he was unable to kneel, he had no problem sitting and that he was able to lift, but not carry, twenty pounds. Additionally, he testified that since his surgery, he could only carry a quart of milk compared to gallon of milk prior to the surgery. (R. 217.) Plaintiff further indicated that he was unable to stoop, and that he now had difficulty climbing stairs. (R. 218.) He stated that he spent most of his time resting with his leg up, watching television, and that the last time he swept or vacuumed was about ten months prior to the hearing. (R. 210-13.) In addition, he told the ALJ that the last time he went shopping or did laundry was about two years prior to the hearing. (R. 213.)

As indicated earlier, Eugene Churchman, a vocational expert ("VE"), testified at the hearing. (R. 229-40.) The ALJ posed hypothetical questions to the VE, prefacing

---

[4]Dr. Hyden's name is phonetically spelled in the hearing transcript and does not appear in the index of exhibits of the Record, nor did plaintiff identify him by his first name or degree.

them with the following: "[f]or purposes of these hypotheticals, please assume someone of the Claimant's age, educational level, past work experience as you've just described with the following limitation." (R. 234.) As a first hypothetical question, the ALJ provided the following limitations, "no stair climbing … able to lift up to 20 pounds, able to stand and walk up to two hours a day, able to sit up to eight hours but needs to walk around hourly . . . for a minute or two . . . ." (R. 234-35.) The VE stated[5] that such a claimant would be able to work as a storage facility rental clerk, DOT number 295.367-026, which is work at the light exertional level, "with a specific vocational preparation of two" and of which there were 85,000 jobs nationally, and 700 regionally. (R. 235.) He also stated that such a claimant could work as an inserting machine operator, DOT number 208.685-018, a position at the light exertional level, with a "specific vocational preparation of two, therefore, also unskilled work . . . ." (R. 235.) The VE indicated that this position had 80,000 positions nationally and 900 regionally. (*Id*.) The VE also stated such a claimant could work as a folder,[6] DOT Number 369.687-018, again a position at the light exertional level, with a "specific vocational preparation of two." (R. 236.) That position, the VE testified, had 75,000 positions nationally and 1,000 regionally.

For his second hypothetical question, the ALJ provided the following limitations: "no stairs, no prolonged sitting, standing or knee bending." (R. 236.) In response, the VE testified that such a claimant could perform the same three jobs he spoke about in

---

[5]The VE also testified that plaintiff could not perform his past relevant work. (R. 234, 236.)

[6] "You find them in laundries, hospitals, motels. The responsibility is to fold the laundry." (R. 239.)

responding to the first hypothetical question. (R. 237.) The ALJ then asked a third hypo-thetical question, with the following physical limitations: "able to walk ½ hour at a time, stand for 20 minutes at a time, no kneeling, lift up to 20 pounds each with each upper extremity but carry only 10 pounds … and no stooping and no stairs." (R. 238.) The VE testified that such a claimant could still perform the three positions he enumerated with respect to the first hypothetical question. (R. 238.) The ALJ then asked whether any of these jobs could be done by a claimant who required an hour nap in the middle of the day, and to this inquiry the VE responded, "[n]o employer is going to give [inaudible] place for someone to nap so I would say no." (R. 238.)

## MEDICAL EVIDENCE

### Evidence from April 1, 2001 to March 7, 2002

On March 16, 2001, plaintiff told John A. Jurik, M.D., his treating physician, that he had pain in both knees, especially with prolonged standing and climbing stairs, and that his left knee sometimes locked. (R. 170.) Upon examination, Dr. Jurik determined plaintiff had bilateral crepitus[7] and tenderness on compression of the patellae, bilater-ally. (Id.) Dr. Jurik did not find any effusion[8] or instability. Dr. Jurik diagnosed bilateral knee pain, likely chondromalacia.[9] (Id.) He instructed plaintiff to perform quadriceps ex-

---

[7] "[A] grating or crackling sound or sensation (as that produced by the fractured ends of a bone moving moving against each other or as that in tissues affected with gas gangrene)." Merriam-Webster's Medical Desk Dictionary (1993), at 151.

[8] "[T]he escape of a fluid from anatomical vessels by rupture or exudation." Merriam-Webster's Medical Desk Dictionary (1993), at 201.

[9] "[A]bnormal softness of cartilage." Merriam-Webster's Medical Desk Dictionary (1993), at 119.

ercises for five to ten minutes, three times per day, for the next two months, and gave plaintiff samples of Vioxx, planning to prescribe formal physical therapy if he noticed no improvement. (R. 170.)

Sometime[10] following his last examination of plaintiff in June 2001, Dr. Jurik completed a Medical Examination for Employability Assessment, Disability Screening, and Alcoholism/Drug Addiction Determination form. (R. 94-95.) Dr. Jurik reported that plaintiff had bilateral knee pain from patello femoral syndrome[11] and recurrent patellar discoloration. (R. 94.) He stated that plaintiff had significant pain on transfer and with prolonged sitting or standing. (R. 94.) He also indicated that plaintiff was unable to regularly bend or climb stairs. In a chart of functional limitations, Dr. Jurik stated that plaintiff was moderately limited in walking, standing, sitting, lifting and carrying, and that he was very limited in climbing. (R. 95 (prolonged standing, sitting or knee bending were contraindicated).) He expressed his opinion that there was no evidence of limitations in pushing, pulling, bending, using the hands, or in mental functioning. (R. 94.) Dr. Jurik pointed out that plaintiff's limitations were expected to last more than ninety days, and that full recovery might not occur for over twelve months from onset. (R. 95.) Dr. Jurik

_____

[10] Dr. Jurik did not date the form, but answered a question on it that he last examined Plaintiff "6/01." (R. 95.)

[11] "Patellofemoral pain syndrome can be defined as retropatellar or peripatellar pain resulting from physical and biochemical changes in the patellofemoral joint. It should be distinguished from chondromalacia, which is actual fraying and damage to the underlying patellar cartilage. Patients with patellofemoral pain syndrome have anterior knee pain that typically occurs with activity and often worsens when they are descending steps or hills. It can also be triggered by prolonged sitting. One or both knees can be affected. Consensus is lacking regarding the cause and treatment of the syndrome." Mark S. Juhn, D.O., Patellofemoral Pain Syndrome: A Review and Guidelines for Treatment, American Family Physician (Nov. 1, 1999) at 2012, available at http://www.aafp.org/afp/991101ap/2012.html (Apr. 19, 2006).

stated that plaintiff needed aggressive physical therapy and noted that an orthopedic consultation had been obtained from Strong Memorial Hospital. (R. 94, 95.)

On June 20, 2001, plaintiff was examined at Strong Memorial Hospital by Jason Snibbe, M.D. (R. 96.) Upon examination, Dr. Snibbe reported the following: that both of plaintiff's knees had full ranges of motion; that he heard a patellar clunk when plaintiff moved his right knee from flexion to extension; that plaintiff had crepitus with flexion and extension of the right knee surrounding his patella; that plaintiff's knee was stable to varus/valgus stress, and there was no tenderness over the medial or lateral joint lines; that plaintiff's right patella was mobile with pain mostly over the medial aspect of the undersurface of the patella; that plaintiff's left knee had no tenderness over the mediolateral joint line; and that although a clunk of the patella was not elicited on range of motion, plaintiff complained of pain. (R. 96.) Dr. Snibbe noted that x-rays of the knees showed normal alignment, and there was no patellofemoral or mediolateral joint osteoarthritis or fracture. (R. 96, 168 (Francis A. Burgenger, M.D., and Lyudia Liao, M.D., PhD, MPH, Consultation Report).) Dr. Snibbe concluded that plaintiff had some form of patellofemoral[12] pain and recommended physical therapy. Dr. Snibbe also recommended that plaintiff take Ibuprofen and ice his knees after activity. (*Id*.) He advised plaintiff to return in two months. (*Id*.)

On September 20, 2001, Dr. Jurik completed another report on plaintiff's knee condition. (R. 97-101.) He indicated: that plaintiff had bilateral knee pain, worse with

---

[12]The record shows this syndrome spelled both as two words, patello femoral, and as one word, patellofemoral.

climbing stairs and prolonged standing, and chondromalacia; that plaintiff also ex-
perienced pain which lasted for one to two minutes when resuming ambulation after
prolonged sitting; that plaintiff had occasional left knee locking and bilateral knee
crepitus and tenderness; that plaintiff did not need an assistive device for ambulation;
that plaintiff could occasionally lift and carry twenty pounds, stand/walk up to two hours
per day, sit for up to eight hours per day (but that he needed to walk around hourly),
and he had no limitation in pushing/pulling; that plaintiff needed to avoid stair climbing;
that he needed occupational rehabilitation; and that plaintiff was unable to do his job as
a food services worker since that position required constant standing and walking. (R.
97-101.)

On October 5, 2001, Dr. Jurik wrote in his treatment notes that plaintiff had been
attending physical therapy for six weeks, but that he was still having difficulties, espe-
cially after prolonged sitting or lying down at night. (R. 170.) Dr. Jurik stated that plaintiff
was to have an orthopedic evaluation the following week and would "remain on disabil-
ity" because he was unable to perform his job, which involved waiting on tables, walking
stairs, and carrying trays. (R. 170)

Documents in the Record on Appeal reveal that plaintiff received physical ther-
apy at Strong Memorial Hospital from August 23, 2001 to November 29, 2001, as
prescribed by Albert Tom, M.D. (R. 102-10, 166-67.) Physical Therapist Andrea
Blanchard,[13] in her November 29, 2001 Physical Therapy Progress Report, noted that

---

[13]The physical therapists' signature is difficult to decipher, thus, this spelling may be
inaccurate.

plaintiff's attendance at therapy was inconsistent, but that he had a slight improvement. (R. 166.)

***Evidence from March 7, 2002 to November 6, 2003[14]***

On March 7, 2002, Dr. Jurik referred plaintiff to William Dolan, M.D., for possible arthroscopic evaluation. (R. 169.) Dr. Dolan evaluated plaintiff on May 2, 2002,[15] and reported in a letter of that date to Dr. Jurik that plaintiff "most likely has chondromalacia patellae, yielding his patellofemoral pain syndrome." (R. 180.) He recommended that plaintiff return to physical therapy for three months, and if that did not work, suggested that "he may be a candidate for arthroscopy." (R. 180.)

On August 5, 2002, plaintiff described continued bilateral knee pain to Dr. Jurik. (R. 164.) At the time, plaintiff used a cane and required knee braces. (*Id*.) Dr. Jurik stated that plaintiff likely needed arthroscopy. Plaintiff also complained that for three weeks he was experiencing painful swelling on his left sole. (*Id*.) Upon examination of his left foot, Dr. Jurik found that plaintiff's pulses were strong, his sensation was intact, and he had full range of motion of his ankles and toes, but that he had a tender, cystic mass along the middle sole of his foot. (R. 164.) Dr. Jurik diagnosed a possible ganglion cyst and referred plaintiff to Dr. Tallo for surgical evaluation. (*Id*.)

Dr. Tallo examined plaintiff on August 12, 2002, and found that plaintiff's pedal pulses were patent and full bilaterally. (R. 120.) Dr. Tallo also performed a neurological

---

[14]The Appeals Council awarded benefits to Plaintiff for this period of time.

[15]Dr. Dolan's letter is dated May 2, 2002, and indicates that he evaluated plaintiff on May 2, 2001, which is evidently a typographical error.

examination of plaintiff's lower extremities, finding them normal. (*Id.*) His examination revealed that plaintiff's left plantar foot had a cystic mass, with pain on palpation. Dr. Tallo ordered a magnetic resonance image ("MRI"). (*Id.*)

On September 17, 2002, Gail E. Stokoe, M.D., at The IDE Group, interpreted plaintiff's left foot MRI and determined that it revealed moderate osteoarthritis of the distant navicular as it articulated with the cuneiforms, and similar degenerative changes of the bases of the metatarsal bones and that there was no evidence of fracture, subchondral cyst formation or ganglions. (R. 121-22.) She also interpreted an MRI of plaintiff's right foot which she stated revealed marked osteoarthritis of the talonavicular joint, as well as the cuneiforms. (R. 121-22.) She did not find any subchondral cyst formation or ganglions, but did note mild tenosynovitis of the posterior tibialis tendon. (R. 122.)

On January 20, 2003, plaintiff underwent arthroscopic right knee surgery by Dr. Dolan. (R. 127-55, 174.) In his operative note, dated January 20, 2003, Dr. Dolan noted that postoperatively plaintiff's right knee showed, "[c]hondromalacia patella, grade 3, subluxing patella with lateral compression syndrome, torn lateral meniscus, grade 3 and 4 degenerative changes medial femoral condyle…." (R. 135.) Dr. Dolan reported that plaintiff "[t]olerated the procedure well and left the operating room in satisfactory condition." (R. 135.)

In early 2003, plaintiff was treated for shingles and right shoulder pain. (R. 161-62, 172, 173.) An MRI of his right shoulder revealed changes in the supraspinatus

and infraspinatus tendons, consistent with tendinopathy and some inflammation of the subdeltoid bursa, and small joint effusion. (R. 157, 197.)

On April 29, 2003, Dr. Dolan reported that plaintiff was making some progress after his right knee surgery. (R. 172.) He stated that plaintiff was to attend physical therapy for three months, at which point he would return to see Dr. Dolan and a decision would be made regarding surgery of his left knee. (*Id*.)

When plaintiff returned to Dr. Dolan on July 29, 2003, his right knee had no effusion, had full range of motion, had minimal crepitus and was negative for compression apprehension testing. (R. 186.) He still had some quadricep atrophy. (*Id*.) Dr. Dolan advised plaintiff to return in six months. (*Id*.)

### Evidence from November 6, 2003 Forward

On November 6, 2003, Dr. Dolan reported that plaintiff had done exceedingly well following his right knee surgery, and that plaintiff wanted surgery on his left knee. (R. 187.) Dr. Dolan referred plaintiff to Steven Posnick, M.D. (*Id*.)

Dr. Posnick evaluated plaintiff on January 2, 2004. (R. 190.) Plaintiff reported left knee pain, exacerbated by traversing stairs and squatting. (*Id*.) He said he experienced minimal pain with standing and walking, and he denied any locking or swelling. Upon examination, Dr. Posnick noted that plaintiff's knee had symmetric range of motion, equal to the right knee; that there was no effusion, gross instability, patellar apprehension or crepitus; that there was some medial joint line tenderness; and that a neurovascular examination was distally intact. (R. 190.) Dr. Posnick also reported that x-rays revealed good maintenance of his joint spaces on his weight bearing views, as

well as a "well-centered patella on the sunrise view." (*Id.*) Dr. Posnick diagnosed chronic patellofemoral syndrome and a possible medial meniscal tear. He ordered an MRI. (*Id.*)

Michael Bowers, M.D., examined a January 9, 2004 MRI of plaintiff's left knee. He reported that the MRI revealed a small cyst, but no other significant finding. (R. 196.)

On January 16, 2004, Dr. Posnick saw plaintiff for a follow-up after the MRI. Dr. Posnick noted that, despite the lack of definitive pathology, arthroscopic surgery was being scheduled, at plaintiff's request, in view of the long nature of problems and plaintiff's failure to improve with conservative therapy. (R. 189.)

On April 22, 2004, Dr. Posnick operated arthroscopically on plaintiff's left knee. (R. 194-95.) His operative findings revealed grade I to grade II chondromalacia of the patella and some synovitis.[16] (R. 194.) He also noted that there was grade II to grade III chondromalacia involving the medial femoral condyle; that the medial meniscus had no tear; and that the anterior cruciate ligament and the lateral compartment were intact. (R. 194.)

## THE STANDARD OF REVIEW

The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on

---

[16]Synovitis is an "inflammation of a synovial membrane usually with pain and swelling of the joint." Merriam-Webster's Medical Desk Dictionary (1993), at 699.

an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). It is well settled that

> it is not the function of a reviewing court to determine *de novo* whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980); *see also Williams v. Callahan*, 30 F. Supp. 2d 588, 592 (E.D.N.Y. 1998); *Fishburn v. Sullivan*, 802 F. Supp. 1018, 1023 (S.D.N.Y. 1992). Thus, the scope of review involves first the determination of whether the ALJ applied the correct legal standards, and second, whether the ALJ's decision is supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Substantial evidence is more than a mere scintilla. It is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). Although district court is not bound by the Commissioner's conclusions and inferences of law, the ALJ's findings and inferences of fact are entitled to judicial deference. *Grubb v. Chater*, 992 F. Supp. 634, 637 (E.D.N.Y. 1998).

Where there are gaps in the administrative record or where the Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Parker*, 626 F.2d at 235. However, where the record provides per-suasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004).

***Treating Physician Rule***

The law gives special weight to the opinion of the treating physician. The SSA's regulations provide:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The various factors applied when the treating physician's opinion is not given controlling weight include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. *Id*. The regulations further provide that the SSA "will always give good reasons" for the weight given to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2) (2004); *see also, Schaal*, 134 F.3d at 503-504; *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

**ANALYSIS**

Relying on Dr. Posnick's March 2, 2005 examination notes, plaintiff argues that the Commissioner's determination that he was not disabled prior to March 7, 2002 or after November 6, 2003[17] is unsupported by substantial evidence. Dr. Posnick wrote

---

[17]As stated above, the Appeals Counsel found plaintiff eligible for benefits during the period from March 7, 2003 through November 6, 2003.

that plaintiff "remains disabled at this point due [to] a combination of the bilateral patellofemoral syndrome. He has been completely disabled for the past four years." (Steven Posnick, M.D., treatment notes, attached to Pl.'s Mem. of Law (# 14).) Although this information was sent to the Appeals Council[18] on March 10, 2005, by way of a letter from Kevin J. Banbury, Esq., a copy of which is also attached to plaintiff's memorandum of law, it is not listed in the Record on Appeal. Nevertheless, that evidence can be considered by the Court in its § 405(g) review. *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996). Dr. Posnick is obviously a treating physician (he performed the left knee operation. Consequently, his opinion is controlling, as long as it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The Appeals Council decision did not address Dr. Posnick's medical opinion that plaintiff was disabled as of March 2, 2005, nor did it address Dr. Posnick's retrospective medical opinion that plaintiff had been disabled for four years prior to March 2, 2005. *Perez*, 77 F.3d at 48. At the very least, the Appeals Council should have sought additional information from Dr. Posnick with regard to his conclusions.

With regard to plaintiff's credibility, the ALJ determined that plaintiff had not used his pain medications in the recent past, and concluded, therefore, that he was exagger-

---

[18]The Appeals Council decision is dated June 2, 2005. (R. 12.) In the first page of that decision, the appellate judges wrote that on February 18, 2005, they sent out a notice to plaintiff inviting him to submit additional evidence and notifying him of their intention to find him disabled for the period from March 7, 2002 to November 6, 2003. (R. 7.) The decision also states that "no comments or additional evidence have been received." (R. 7.) Counsel's March 10, 2005 letter should have reached the Appeals Council prior to the 30-day cutoff listed in their notice.

ating his subjective description of pain. (R. 253.) However, the evidence before the Appeals Council from Dr. Posnick contains this information: "In the past he did have to go off ibuprofen temporarily for his GI tract even though he still needed it for the pain." (Steven Posnick, M.D., treatment notes, attached to Pl.'s Mem. of Law (# 14).) When Dr. Posnick's evidence was presented to the Appeals Council, that body should have further investigated the reason why plaintiff had not been taking the prescribed pain medications, which could have impacted the Commissioner's decision concerning Plaintiff's credibility. It is interesting to note that the Commissioner now argues before this Court that the Appeals Council found plaintiff's subjective complaints incredible for the period prior to March 7, 2002, or after November 6, 2003. This argument logically implies that the Commissioner's argument found plaintiff's subjective complaints credible for the period between March 7, 2002 to November 6, 2003. The Appeals Council's written opinion, however, does not explain why it considered plaintiff less credible before and after that period. (R. 7-12.)

The Court, therefore, determines that the Commissioner's decision must be reversed and a new hearing conducted to correct these errors and to further develop the record.

## CONCLUSION

Accordingly, the Commissioner's motion (# 10) for judgment on the pleadings is denied, and plaintiff's motion (# 14) is granted as to the alternative relief he requested,

in that the Commissioner's decision denying benefits is reversed and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for a new hearing.[19]

It is So Ordered.

Dated: May 26, 2006
       Rochester, New York

               ENTER:

                        /s/ Charles J. Siragusa
                        CHARLES J. SIRAGUSA
                        United States District Judge

---

[19] The Court denies that portion of plaintiff's alternative request for relief, directing that the hearing be before a different Administrative Law Judge. The plaintiff not established any basis for such relief.